John McClure SNOOK, Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 71–1838
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Nov. 10, 1971.

Rehearing Denied Dec. 1, 1971.

* [1] Rule 18, 5 Cir.; See Isbell Enter-prises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir., 1970, 431 F.2d 409.

C. S. White-Spunner, Jr., Mobile, Ala., Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Ann E. Belanger, Attys., Dept. of Just., Tax Div., Washington, D. C., Grant W. Wiprud, Atty., Tax Division, Department of Justice, Washington, D. C., of counsel, for defendant-appellant.

Donald F. Pierce, Edward A. Hyndman, Jr., Mobile, Ala., for plaintiff-appellee; Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., of counsel.

Before JOHN R. BROWN, Chief Judge, and INGRAHAM and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

██ Despite the unfortunate understaffing of many local law enforcement agencies and the undeniable value of assistance rendered them by conscientious citizens, we hold that the voluntary participation of a private individual in an honorary deputy sheriffs club does not automatically exempt that person from Federal excise taxes in the arming of a private quasi-militia with automatic rifles and sub-machine guns which are never used in performance of police functions. The District Court having thought otherwise and having directed a verdict to that effect, we accordingly reverse the decision below.

The evidence in the present case is clear and uncontroverted. Taxpayer was the president and part owner of a telephone company in Foley, Alabama.[1] Over the years he accumulated a rather formidable collection of automatic weapons.[2] Motivated in part by fear of a deterioration of the international situation and desiring to prepare local citizens to take a "defensive stand," he organized the company personnel into a "drill squad" and "shooting team" and conducted weekend training sessions and practice programs.

Indeed, what brought about Taxpayer's predicament was his skill as a weapons artificer in rehabilitation and conversion. Some of the weapons were in less than operational order when acquired, so Taxpayer personally rehabilitated and converted them to automatic status. Meanwhile, he had completely ignored—perhaps he was not even aware of—the provisions of the Internal Revenue Code relating to transfer, alteration and registration of automatic weapons,[3]

---

1. Foley, Alabama is situated in the largest county in the state. Baldwin County, of which Bay Minette is the county seat, encompasses approximately 1,500,000 acres of land and had a 1970 population of 58,193.

2. Taxpayer had the following automatic weapons in his possession in 1962: two Schmeisser sub-machine guns, two modified U. S. Carbines, Model M-1, one H & R Reising automatic rifle, one Thompson sub-machine gun, and two Savage Action .22 caliber sub-machine guns.

3. The relevant provisions of the Internal Revenue Code included §§ 5811, 5812, 5814, and 5821. These, in effect, provide for tax on transfer of automatic weapons, require Government order forms for transfer of these weapons, provide for tax on and declaration of the "manufacture, putting together [or] alteration" of such firearms, and exempt, *inter alia* "peace officers" from the requirements of the chapter.

which, on a tax structure, was the federal way of dealing with the use of gangster weapons in organized crime. As a result of this non-compliance, the District Court for the Southern District of Alabama issued a condemnation order in a 1964 libel proceeding and the weapons were condemned to the United States. Subsequently, the Commissioner of Internal Revenue assessed a deficiency in excise taxes due upon the making and transfer of the firearms, and the Taxpayer, after having paid the deficiency, now sues for a refund.

▇ The facts show the "making" of automatic weapons and the failure to comply with the reporting and tax requirements. Granting that Taxpayer was, like many citizens, caught by beneficent legislation aimed at quite a different group, his only escape from what is obviously an "innocent" violation of law lies in the "peace officer" exemption [4] to the statute. If he does not have this exemption, he loses and he knows it.

The basis of Taxpayer's claim is that in 1962 and prior years, he carried a "special" or "auxiliary" deputy sheriff card issued by the Sheriff of Baldwin County, Alabama, and therefore, he came within the exemption. While we agree that Taxpayer was a "peace officer" under Alabama and thus necessarily under Federal law,[5] we interpret the statute to require more than mere status to trigger the protective exemptions of § 5812 and § 5821.

Though the statute in its *literal* wording suggests no limitation to its broad grant to exclusion to "any peace officer," we think it takes no great prescience to perceive that Congress was legislating in terms of firearms bearing a sensible relationship to law enforcement activities. Indeed, in the confrontation of law enforcement officers with hoodlums, gangsters and organized criminals, Congress did not intend to afford law enforcement officials less of an arsenal than the adversary.

Thus it seems clear that the purpose of the National Firearms Act was to make more difficult and controlled the acquisition of certain types of weapons "likely to be used by the gangster element." [6] The Act sought to make law enforcement work easier and safer by restricting the availability of highly dangerous weapons. This interpretation of the purpose of the provisions in question is bolstered by language in the Report of the House Committee on Ways and Means accompanying H.R. 9741, 73rd

---

4. Section 5821(b) (3) (B) of the Internal Revenue Code of 1954, on which the Taxpayer relies, provides:

"(b) Exceptions.—The tax imposed by subsection (a) shall not apply to the making of a firearm—

(3) for the use of—

(A) the United States Government, any State, Territory, or possession of the United States, any political subdivision thereof, or the District of Columbia, or

(B) any peace officer or any Federal officer designated by regulations of the Secretary or his delegate."

Section 5812 of the Code provides a similar exemption from requirements relating to transfers of the subject firearms.

5. Under Alabama law, a sheriff has virtually unlimited discretion to select and appoint deputies on a fee basis. Code of Alabama, Title 54, Section 3. And the courts of Alabama have consistently upheld the authority of all types of deputies against challenges to their being "officers of the state." Andrews v. Alabama, 1885, 78 Ala. 483; Floyd v. Alabama, 1885, 79 Ala. 39 (a third person cannot collaterally attack the authority of such officer) ; Pentecost v. Alabama, 1894, 107 Ala. 81, 18 So. 146 (deputization need not be formal). Thus, we think the distinguished Alabama Federal District Judge was correct in holding Taxpayer to be a peace officer under Alabama law. In the structure of the Act, who is a peace officer has to be determined by reference to state law for tax act purposes. Cf. Lehman v. United States, 5 Cir., 1971, 448 F.2d 1318.

6. 1960 U.S.Code Cong. & Admin.News, p. 2113. See also, Haynes v. United States, 1968, 390 U.S. 85, 87 n. 4, 88 S.Ct. 722, 725, 19 L.Ed.2d 923, 927.

Cong., 2d Sess., Rep't No. 1780: "While there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, there is no reason why anyone except a law officer should have a machine gun or sawed-off shot gun."

Moreover, although we have been unable to find any legislative history directly relating to the exemption in question, the purpose of that provision seems equally apparent—sometimes law officers may need sophisticated weaponry for their own protection or for subduing the quarry in the investigation and apprehension of criminals. Thus, while desiring to make acquisition of dangerous weapons more difficult and supervised generally Congress did not wish to handcuff law enforcement agents engaged in legitimate criminal investigations, as "peace officers" under state law.[7]

Applying that understanding to the facts of the instant case, it is apparent that Taxpayer's possession of the weapons in question was contrary to the specific purpose for which the Act was passed (namely, to reduce the number of sub-machine guns, sawed-off shotguns and similar dangerous armaments generally available) and in no way furthered the purpose of the exemption—to aid law enforcement efforts legitimately requiring automatic weapons for safety or effectiveness.

■■ In this case, the record establishes positively that the weapons in Taxpayer's possession were acquired and used by him in a purely private capacity and were in no way required by or related to his actual activities as a special auxiliary deputy sheriff. The firearms were initially acquired as a personal

weapons collection. Subsequently, Taxpayer used them to organize a quasi-militia or drill team among a number of employees of his telephone company. He then directed this group in conducting a drilling and shooting program at a local high school. The weapons were displayed and demonstrated at various programs, drills, parades and ceremonies, but, as the Sheriff testified, these were not official functions of the Sheriff's Department, nor activities in which Taxpayer was performing acts as a peace officer. The weapons in question were not used in the pursuit of any law enforcement activities.

Granting full credit to Taxpayer's valuable assistance to the full-time constabulary, his services never came close to requiring the use of or the need for these weapons. Among the services provided by Taxpayer were furnishing telephone company vehicles for the removal of fallen trees from public roads, keeping criminal suspects under surveillance, distributing ballot boxes on election day, directing traffic around accidents, evacuating people and clearing roads during a hurricane, looking out for vandalism on Halloween and assisting with ticket sales at the county fair. Surely these activities, while commendable and an important quasi-public service, did not require—or ever call for—the use of five sub-machine guns and three automatic rifles.

If we were to adopt the reasoning of the Taxpayer here, that merely being a card-carrying member of any organization which supports local law enforcement activities or simply being qualified under state law as a "deputy" by the local sheriff avoids requirements of the Act, the purpose for which the Act was passed would be completely undermined

---

7. Apparently administrative difficulties led Congress to conclude that leaving it wholly to the states was unworkable. To cut off the thousands of badge bearers from one kind of courtesy V.I.P. commission or another, Congress changed the wording of the relevant section in 1968 to read that the exemption applies to only "official police organization * * * engaged in criminal investigations." Section 5853 of the 1954 Code as amended by Section 201, National Firearms Act Amendment of 1968, P.L. 90–618, 82 Stat. 1213, 1227.

as law enforcement officers contemplate the prospect of facing a levy en masse from a body of local citizens armed with such fire power.[8]

We are left then with a case in which to construe the statute literally leads to results which Congress sought to prohibit. We choose to read it sensibly to apply only where the possession, transfer or making of automatic weapons is related to the use or need for use by the law enforcement activities of the person seeking the exemption. Status alone is not enough to invoke the immunizing shield—some actual relationship between possession of the weapons and legitimate law enforcement activities must be shown.

We do not mean to discount or in any way demean the wonderful work done by volunteer organizations such as the one to which Taxpayer belonged. But to hold that such status alone entitled them to exemption from Internal Revenue Code provisions regulating the manufacture and transfer of automatic weapons simply ignores what Congress meant to do by the National Firearms Act.

Of the facts and inferences in this case there can be no doubt. The Trial Court's error was in misapprehending the *legal* implication, not in mistaking the facts. Thus, since all the evidence points so strongly and so overwhelmingly to factual conclusions on which reasonable men could not fail to agree, and those findings lead inexorably to the legal conclusion that Taxpayer was not entitled to the desired exemption merely because of his status as a peace officer, a directed verdict for the Government would have been in order, and should have been granted. Boeing Co. v. Shipman, 5 Cir., 1969, 411 F.2d 365 (en banc).

Reversed and remanded.

---

8. In fact, there were more than 400 persons engaged in law enforcement support or belonging to "auxiliary" sheriffs clubs in the Foley area in 1962. In addition to the organization to which Taxpayer belonged, there was a Sheriff's Mounted Posse and a Sheriff's Flotilla (an organization of boat owners).